IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARCUS & SHAPIRA LLP and ROBERT )
M. BARNES, SCOTT D. LIVINGSTON, )
BERNARD D. MARCUS, JONATHAN D. )
MARCUS, DANIEL H. SHAPIRA, and )
STEPHANIE M. WEINSTEIN trading as )
MARCUS & SHAPIRA LLP, )
                                       )
              Plaintiffs, )
                                       )
       v.                              )    Civil Action No. 25-742
                                       )
SANDRA R. TARR, )
                                       )
              Defendant. )

## MEMORANDUM OPINION

### I.  INTRODUCTION

Plaintiffs Marcus & Shapira LLP, Robert M. Barns, Scott D. Livingston, Bernard D. Marcus, Jonathan D. Marcus, Daniel H. Shapira, and Stephanie M. Weinstein (collectively "Marcus & Shapira") filed a Complaint against former long-time client, Defendant Sandra R. Tarr, asserting claims against her for breach of contract and quantum meruit. Tarr filed a motion to dismiss these claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 10). The parties have fully briefed the matter (ECF Nos. 11, 15, 16). For the reasons set forth herein, Tarr's motion will be denied.

### II.  FACTUAL BACKGROUND

At this stage of the case, the following factual allegations set forth in the Complaint must be taken as true and viewed in the light most favorable to Marcus & Shapira.

1

Tarr is the daughter of the late I. Todd Dobkin, who founded several corporations including Therm-O-Rock East, Inc. ("TORE"), Therm-O-Rock West, Inc. ("TORW"), and Acme Management, Inc. ("ACME") (collectively, the "Family Companies"). (ECF No. 1 ("Complaint"), ¶ 2). Mr. Dobkin established a revocable living trust (the "Trust"), which by February 1995 owned near or bare majorities of the stock in the Family Companies. (*Id*., ¶ 25). Tarr and her brothers, Ed and Ron, each owned one-third of the remainder of the stock in those companies and they each were designated as co-trustees and co-beneficiaries of the Trust in the event of Mr. Dobkin's death. (*Id*., ¶¶ 24-25).

In early 1995, Mr. Dobkin became mentally incompetent because of deteriorating health, so Tarr and her brothers entered into an oral agreement, on behalf of themselves and the Family Companies, to pay income and benefits to Tarr in return for her consent to corporate actions that allowed her brothers to take control of the Family Companies away from her and to take assets intended for her benefit, including approximately $1 million in Treasury bills. (*Id.*, ¶ 26). Then, in October 1995, upon Mr. Dobkin's death, Tarr's brothers took actions to dilute Tarr's ownership interest by issuing stock to themselves and significantly reducing Tarr's income and benefits from the Family Companies in breach of their agreement. (*Id.*, ¶ 26).

Tarr decided to pursue litigation against her brothers and the Family Companies in the Court of Common Pleas of Allegheny County, Pennsylvania (No. G.D. 97-3355) (the "Allegheny County Litigation"), so she entered into an Engagement Agreement with Marcus & Shapira, dated August 12, 1997. (*Id.*, ¶¶ 28, 29). This Engagement Agreement is in writing and is attached to the Complaint at Exhibit 1. (*Id.*, Ex. 1). According to the express terms of the Engagement Agreement, Tarr hired Marcus & Shapira to represent her "in connection with the [Allegheny County Litigation] and related litigation, and in connection with a buy-out or other realization of [her]

2

interests in" the Family Companies. (*Id.*). The Engagement Agreement sets out the fee structure for these legal services, in pertinent part, as follows:

> [Marcus & Shapira] will receive as attorneys' fees twenty-five percent (25%)[1] of **all monies recovered in connection with the above referenced [Allegheny County Litigation] and buy-out or other realization of [Tarr's] interests in the [Family Companies], whenever such a buy-out or realization may occur**. [Marcus & Shapira] will also receive a non-refundable retainer in the amount of $65,000.00, to be paid with the return of one signed counterpart of this letter confirming that [Tarr] accept the terms and conditions of representation set forth herein. The full amount of the retainer will be credited against any contingency fee paid to [Marcus & Shapira] as provided herein. In the event no monies are recovered, [Marcus & Shapira] will receive no attorney's fees except for the retainer.

(*Id.*, ¶¶ 29-31 (emphasis added)).

In the subsequent two years, Marcus & Shapira represented Tarr in the Allegheny County Litigation including at trial in October and December 1998, ultimately prevailing. (*Id.*, ¶¶ 32-33). On December 22, 1999, the Allegheny County Court of Common Pleas entered the Initial Decree awarding Tarr $534,815 in damages, annual payments of $122,990 to continue for her lifetime or until she sold her interests in the Family Companies, and an additional annual payment for specified benefits. (*Id.*, ¶ 33). On February 2, 2000, the Allegheny County Court of Common Pleas entered the Final Decree. (*Id.*). Both the Initial Decree and Final Decree are attached to the Complaint at Exhibit 2. (*Id.*, Ex. 2). As a result of the successful outcome in the Allegheny County Litigation and Tarr's recovery therefrom, Marcus & Shapira received its earned fee on the damage award and on Tarr's annual payments "recovered in connection with the above-referenced [Allegheny County Litigation]." (*Id.*, ¶ 36 and Ex. 1).

---

[1]    Separately, the Engagement Agreement provides that the fee will be limited to ten percent (10%) of all monies recovered if Marcus & Shapira were able to effectuate a recovery within three (3) months. (Complaint, Ex. 1).

Marcus & Shapira continued to provide legal services to Tarr without additional payment for nearly 25 years on the understanding that it was protecting and securing the value of her lifetime payments and ownership interests in the Family Companies. (*Id.*, ¶¶ 6(a) – (m), 36-38, and Ex. 1). Marcus & Shapira also represented Tarr at annual directors' and shareholders' meetings, reviewed financial and other corporate documents, counseled Tarr through actual and attempted corporate actions, and defended Tarr against continued attempts by her brothers to weaken or eliminate her interests in the Family Companies. (*Id.*, ¶ 38). Additionally, Marcus & Shapira represented Tarr in at least three major disputes related to the Family Companies. In 2003 and 2004, Marcus & Shapira represented Tarr in proceedings to enforce the Final Decree when certain Family Companies failed to comply with the Decree's provisions relating to tax distributions. (*Id.*, ¶ 41). In 2022, Marcus & Shapira represented Tarr in negotiations with her brothers to dissolve the Trust and split the Family Companies whereby Tarr ceded control of TORW to one of her brothers. (*Id.*, ¶ 42). Tarr paid Marcus & Shapira it's agreed upon fee percentage when it negotiated a lump sum to be paid to her for the buy-out of her interest in TORW. (*Id.*, ¶ 38). Then, in 2024, Marcus & Shapira represented Tarr in disputes that arose following the death of her brother Ed. (*Id.*, ¶ 44).

The disputes arising from her brother Ed's death led to the dispute *sub judice*. After Ed's death, according to the terms of the TORE Shareholder Agreement, TORE was required to purchase, and Ed's Estate was required to sell, Ed's shares in TORE at book value which would have resulted in Tarr holding 100% of the voting rights and outstanding shares of TORE. (*Id.*, ¶ 45). TORE and Ed's Estate refused to comply with these buyout provisions, so Marcus & Shapira counseled Tarr through a series of corporate actions, undertook lengthy negotiations with TORE and Ed's Estate on Tarr's behalf seeking to secure either their compliance with the Shareholder Agreement or the sale of Tarr's interests, and even prepared a complaint and motion

for a preliminary injunction in the event resolution could not be reached short of litigation. (*Id.*, ¶¶ 46-47). Tarr's Complaint details a "complex series of events . . . and developments" during this process. (*Id.*, ¶ 48 (a)-(n)). Ultimately, Marcus & Shapira's negotiations, backed by the threat of legal action, proved fruitful as it helped Tarr reach an agreement in principle to sell her interests in TORE and ACME for a guaranteed $3.5 million, to be paid $350,000 per year over a period of ten years in a deal that was approved by the bank. (*Id.*, ¶ 49). Tarr agreed to this buyout with full knowledge and understanding that Marcus & Shapira was entitled to 25% of the value of the agreement. (*Id.*, ¶ 50).

Despite reaching this agreement in principle, Tarr's sons got involved and indicated that Tarr would only agree to the deal if Marcus & Shapira reduced its fee. (*Id.*, ¶ 52). When Marcus & Shapira refused to do so, Tarr obtained new counsel and terminated her attorney-client relationship with Marcus & Shapira. (*Id.*, ¶ 52). Marcus & Shapira further contends that Tarr signed a term sheet to sell her interest in TORE and/or ACME at a value substantially lower than what Marcus & Shapira negotiated for her. (*Id.*, ¶ 53). Then, in April 2025, Marcus & Shapira stopped receiving fee payments on Tarr's annual lifetime payments, which it previously received each month for over two decades. (*Id.*, ¶ 57).

Based upon the foregoing, Marcus & Shapira asserts that Tarr breached the Engagement Agreement by not paying the agreed upon 25% fee for "all monies recovered in connection with [the Allegheny County Litigation] and buy-out or other realization of Tarr's interests in the Family Companies, whenever such a buy-out or realization may occur." (*Id.*, ¶ 61 and Ex. 1). Marcus & Shapira contends that its fee was earned on February 2, 2000, when the contingency of the Allegheny County Litigation came to fruition by virtue of the Final Decree. (*Id.*, ¶ 62). Alternatively, Marcus & Shapira asserts a claim for quantum meruit for services rendered from

February 2, 2000, through November 2024, when Tarr terminated their attorney-client relationship. (*Id.*, ¶¶ 67-71).

### III.   <u>STANDARD OF REVIEW</u>

In considering a Rule 12(b)(6) motion to dismiss, the factual allegations contained in the complaint must be accepted as true and must be construed in the light most favorable to the plaintiff; the court must also "'determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007). While Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," the complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 550 U.S. at 555 (internal citation omitted)). Moreover, while "this standard does not require 'detailed factual allegations,'" Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The Supreme Court has noted that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal

evidence of' the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). Moreover, the requirement that a court accept as true all factual allegations does not extend to legal conclusions; thus, a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555 (internal citation omitted)).

To review a complaint under this standard, the Court proceeds in three steps. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). First, the Court notes the elements of the claim. *See id.* (citing *Iqbal*, 556 U.S. at 675). Second, the Court eliminates conclusory allegations. *See id.* (citing *Iqbal*, 556 U.S. at 679). And finally, the Court assumes the remaining well-pleaded facts are true and assesses "'whether they plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## IV.    DISCUSSION

### A.    Breach of Contract

A cause of action for breach of contract is established by pleading and proving: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *See Key Consolidated 2000, Inc. v. Troost*, 432 F. Supp. 2d 484, 487 (M.D. Pa. 2006) (citing *Corestates Bank N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Here, Tarr does not assert the existence of any pleading deficiencies concerning contract formation or adequate consideration. Rather, she asserts that her Engagement Agreement with Marcus & Shapira was on a contingency fee basis and when she terminated their engagement "before resolution of the case" (ECF No. 11, at 4), fees were no longer owed to Marcus & Shapira.

Marcus & Shapira disagrees, asserting that the contingency contemplated by their Engagement Agreement had been satisfied long ago and Tarr's fee obligations remain.

Pennsylvania law permits attorneys and clients to enter into contingency fee agreements. Pennsylvania law also permits clients to terminate a contingency fee agreement even before the contingency occurs. The Pennsylvania Superior Court has noted that:

> Attorneys are allowed to enter into contingency fee agreements because they provide attorneys with the potential for a higher fee, which compensates the attorneys for assuming the risk of nonpayment for services in the event a case is lost. *See* Lester Brickman, ABA Regulation of Contingency Fees: Money Talks, Ethics Walks, 65 Fordham L. Rev. 247, 271 (1996) ("The ethical justification for these approvals necessarily lies in the assumption that the lawyer's risk of receiving no fee, or a fee that effectively will be well below her normal hourly rate or opportunity cost, merits compensation in and of itself: Bearing the risk entitles the lawyer to a commensurate risk premium."). Clients, however, are largely shielded from incurring a financial loss resulting from an unfavorable outcome.
>
> *            *            *
>
> Without question, contingency fee agreements serve a salient purpose. Besides compensating attorneys for assuming the risk of nonpayment in the event the case is lost, such arrangements allow for the vindication of legal rights and enable injured persons access to both counsel and the courts.
>
>> In exchange for assuming the risk of no or low recovery, as well as the risk of having to devote considerably more time to the venture than anticipated, the attorney charges a risk premium: ... That premium is both payment for the lawyer's lending of services to the client and assumption of the recovery and time expenditure risks. A contingent fee is, therefore, a financing device which provides access to the courthouse for both the impecunious client and the risk-averse client ...
>
> Lester Brickman, Setting The Fee When The Client Discharges A Contingent Fee Attorney, 41 Emory L.J. 367, 379-380 (1992) (footnotes omitted).

> With a contingency agreement, an attorney will evaluate the risks related to a recovery in a case and what percentage of an award will best compensate the attorney and the firm for their labors. The attorney accepts the risk that if there is no recovery, then the attorney receives no compensation.

*Angino & Rovner v. Jeffrey R. Lessin & Associates*, 131 A.3d 502, 508-509 (Pa. Super. Ct. 2016).

Under Pennsylvania law, "a client has the absolute right to terminate the attorney-client relationship regardless of any contractual arrangement between the two parties." *Kenis v. Perini Corp.*, 682 A.2d 845, 849 (1996) (citing *Hiscott and Robinson v. King*, 626 A.2d 1235 (1993), *allocatur denied*, 644 A.2d 163 (1994)); *see also* Pennsylvania Rules of Professional Conduct, Rule 1.16 cmt. [4] ("A client has a right to discharge a lawyer at any time, with or without cause, **subject to liability for payment for the lawyer's services** . . . ." (emphasis added)).  In fact, "[a] client's right to discharge his attorney for any or no reason and without penalty is an implied term of every attorney-client engagement contract and is based on the unique concepts of trust and confidence that flow from this fiduciary relationship." *Angino & Rovner*, 131 A.2d 508-09. In determining the method of compensating attorneys who are released from serving their clients, Pennsylvania courts look to the rule set forth in *Sundheim v. Beaver County Bldg. & Loan Ass'n*, 14 A.2d 349, 351 (Pa. Super. Ct. 1940), which held that "[a] client may terminate his relation with an attorney at any time, notwithstanding a contract for fees, but if he does so, thus making performance of the contract impossible, the attorney is not deprived of his right to recover on a quantum meruit a proper amount for the services which he has rendered." *Hiscott and Robinson v. King*, 626 A.2d 1235, 1237 (Pa. Super. Ct. 1993);

With these standards in mind, the questions here are whether Marcus & Shapira adequately plead the existence of a contractual entitlement to attorneys' fees, and whether Tarr's termination of the attorney-client relationship made Marcus & Shapira's ongoing contractual performance

9

impossible. For this second question, stated differently, were the fees now in dispute contingent and no longer achievable because Tarr terminated the relationship and thus made performance impossible, or were such fees already earned and thus no longer contingent?  The Court first looks to the text of the Engagement Agreement itself to answer these questions. First, the Court notes the scope of the attorney-client engagement set forth in the Engagement Agreement is "in connection with [the Allegheny County Litigation] and related litigation, and in connection with the buy-out or other realization of [Tarr's] interests" in the Family Companies.  (Complaint, Ex. 1).  The Engagement Agreement further provides that for such legal services, Tarr agreed that Marcus & Shapira "will receive as attorneys' fees twenty-five percent (25%) of all monies recovered in connection with the above referenced litigation and buy-out or other realization of [Tarr's] interests in the [Family Companies], whenever such a buy-out or realization may occur." (*Id*.).

At minimum, when agreed upon in 1997, and as written, the Engagement Agreement provides that attorneys' fees were to be paid as a set percentage of all monies "recovered in connection with" the Allegheny County Litigation.  (*Id*.).  At the time the parties formed this contract, the Allegheny County Litigation was pending and its outcome undetermined.  That contingency came to fruition when a Final Decree was issued in the Allegheny County Litigation approximately two and half years later, on February 2, 2000. (Complaint, ¶¶ 61-62).  Accordingly, the Court concludes that Marcus & Shapira adequately plead that attorneys' fees from monies directly attributable to winning the Allegheny County Litigation have been earned and are no longer contingent, and therefore it is plausible that the Engagement Agreement contractually entitled it to 25% of "all monies recovered in connection with" the Allegheny County Litigation,

which includes such percentage of Tarr's annual lifetime payments, even for such annual payments made to Tarr after she terminated her attorney-client relationship.

The harder question to answer is whether "all monies recovered in connection with the . . . buy-out or other realization of [Tarr's] interests in the [Family Companies], whenever such a buy-out or realization may occur," was also earned upon winning the Allegheny County Litigation in 2000, or whether such fees are considered contingent until such buy-out or realization occurs.  For instance, Marcus & Shapira avers that Tarr realized some such funds in 2022 when it negotiated a deal on Tarr's behalf that resulted in an increase to her annual payments, up from $122,990 to $200,000.  (Complaint, ¶¶ 42-43).   Tarr acknowledged owing applicable attorneys' fees on these funds.  (*Id.*).  Were these attorneys' fees earned upon being "recovered" and based upon Tarr's victory in the Allegheny County Litigation that ostensibly gave rise to her right to realize such funds, or were such fees contingent and not earned until Tarr received such funds in 2022?  What do the contractual terms "recovered" and "realized" mean?  The same questions arise when considering Marcus & Shapira's averments concerning Tarr's divestiture of her stake in TORE and/or ACME in 2024 or 2025.  (Complaint, ¶ 58).

These questions will need to be answered when adjudicating the merits of Marcus & Shapira's breach of contract claim. For now, however, the principal question is narrower. That is, whether Marcus & Shapira adequately plead that "monies recovered in connection with . . . [such] buy-outs or other realization of [Tarr's] interests in the [Family Companies]" were earned prior to the termination of the attorney-client relationship.  When evaluating the pleadings for an answer to this question, this Court must accept all well-pleaded facts as true and must draw all inferences in favor of Marcus & Shapira.  *See Phillips*, 515 F.3d at 233.  In this Court's estimation, in doing so, Marcus & Shapira has plead sufficient factual averments – including the express terms of the

11

Engagement Agreement, the decisional outcome of the Allegheny County Litigation, and the parties' course of dealing – to establish a plausible claim that the attorneys' fees for the monies Tarr recovered in connection with the buy-out or other realization of her interests in the Family Companies were earned prior to the termination of the attorney-client relationship even though such buyout and realization of those funds did not occur until after such termination.[2]  Accordingly, the Court will deny Tarr's Motion to Dismiss Count I of the Complaint.

### B.  <u>Quantum Meruit</u>

Marcus & Shapira alternatively pleads a claim for quantum meruit.  Pleading in the alternative is permitted.  Fed. R. Civ. P. 8 (a)(3), 12(d).  As set forth above, if monies received from Tarr's divestiture of TORE and/or ACME was its own contingency, and if Tarr did, in fact, terminate the attorney-client relationship before such contingency came to fruition, then Marcus & Shapira would not be permitted to recover its fee on the recovery of monies from any such contingency that came to fruition after the termination of the attorney-client relationship. So, if Marcus & Shapira ultimately is unable to establish that it is contractually entitled to the proceeds from Tarr's divestiture of TORE and/or ACME in 2024 or 2025 because of the Allegheny County Litigation or the pre-termination completion of some other contingent event related to the buy-out or other realization of interests, it nonetheless may be entitled to recover the reasonable value of services rendered in quantum meruit for work performed on Tarr's behalf prior to the termination of their attorney-client relationship in 2024.

---

[2]     The Court could also infer from the facts alleged in the Complaint that "monies recovered" from Tarr's divestiture of TORE and/or ACME were contingent upon the outcome of negotiations that Marcus & Shapira participated in long after the conclusion of the Allegheny County Litigation and that such monies were not realized until after Tarr terminated the attorney-client relationship.  Even so, at this juncture, the Court is dutybound to draw all inferences in favor of Marcus & Shapira and determine whether Marcus & Shapira may be entitled to relief under any reasonable reading of the Complaint. *Phillips,* 515 F.3d at 233. At this juncture, such claim need not even be probable, but merely plausible. *Id.* at 234 (quoting *Twombly,* 550 U.S. at 556).

A claim for damages in quantum meruit is fundamentally an equitable claim of unjust enrichment in which the party seeking recovery must demonstrate:

> (1) [the] benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. The application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

*Shafer Elec. & Const. v. Mantia*, 96 A.3d 989, 993 (2014) (internal citations omitted); *see Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 179 A.3d 1093, 1102 (Pa. 2018).  Quantum meruit actions against a former client accrue as of the date of the attorney's termination of representation.  *See Kenis v. Perini Corp.*, 682 A. 2d 845, 849 (Pa. Super. Ct. 1996).

Here, Marcus & Shapira alleges many factual averments that it provided legal services to Tarr for the ensuing 25 years after obtaining a successful outcome in the Allegheny County Litigation without receipt of additional fees.  (Complaint, ¶¶ 37-50, 54). These averments satisfy the elements of a quantum meruit claim.  Even so, Tarr contends that this quantum meruit claim is negated by Marcus & Shapira's receipt of a $65,000[3] retainer that she characterizes in her briefs,

---

[3]     Tarr also contends that the Court should void their fee agreement because it is excessive and unconscionable, stating that $65,000 "would be large in today's legal market, but it was received in 1997[,]" characterizing this amount as "large" and "massive," and suggesting that such fee exceeds the usual and normal fees for similar representation. (Docket No. 11, at 7-11 and n. 2).  Again, this Court must accept all factual averments as true and draw all inferences in Marcus & Shapira's favor.  Moreover, there is nothing on the present record at this early stage of these proceedings to support a conclusion that $65,000 would have been excessive, much less unconscionable, for legal representation in a seemingly complex business dispute in 1997 between sophisticated and litigious family members over the course of two and a half years, and beyond, that culminated in a monetary award including a lump sum payment of $534,815 and annual lifetime payments of $122,990, as well as additional monies recoverable pursuant to a buy-out or other realization of the client's interests in several companies, as further described in a detailed Adjudication and Decree Nisi and Final Adjudication and Decree authored by then-Common Pleas Judge Alan S. Penkower. (Docket No. 1-2).

variably, as "non-refundable," as a "general retainer," and as a "minimum fee that was to be kept . . . regardless of the circumstances."

Again, the Court turns to the actual language contained in the Engagement Agreement, which states:

> [Marcus & Shapira] will also receive a non-refundable retainer in the amount of $65,000, to be paid with the return of one signed counterpart of this letter confirming that you accept the terms and conditions of representation set forth herein. The full amount of the retainer will be credited against any contingency fee paid to [Marcus & Shapira] as provided herein. In the even no monies are recovered, [Marcus & Shapira] will receive no attorney's fees except for the retainer.

(ECF No. 1, Ex. 1). By these express terms, the $65,000 retainer was credited against Marcus & Shapira's 25% share of Tarr's $534,815 damages award set forth in the Initial Decree of the Allegheny County Litigation on December 22, 1999. (Complaint, ¶ 33). As such, it would defy this Court's obligation to construe the pleadings in a light favorable to Marcus & Shapira by accepting Tarr's contention that the $65,000 retainer, which long ago was credited against monies recovered in connection with the Allegheny County Litigation, somehow prevents Marcus & Shapira from pursuing recovery of the value of services rendered in quantum meruit for some or all such services performed over the 25 year period after the completion of the Allegheny County Litigation and before Tarr terminated their attorney-client relationship. Tarr's Reply Brief attempts to resuscitate this unavailing contention by recasting the retainer she previously characterized as "non-refundable" and a "general retainer," as being a "minimum fee that was to be kept by [Marcus & Shapira] regardless of the circumstances." (ECF No. 16, at 6). While this recharacterization most accurately describes the non-refundable retainer provision in the Engagement Agreement, it fairs no better at advancing Tarr's argument because there is a crediting mechanism in the parties' agreement that, as Marcus & Shapira avers, was implicated and exhausted long ago. Tarr points to

14

no applicable controlling authority to the contrary.[4]  *Contra, Judd Burstein, P.C. v. Long*, 180 F.3d 308, 313 (S.D.N.Y. 2016) (applying New York law and holding that "the logic of this rule [of permitting an attorney to recover the reasonable value of services rendered in quantum meruit] applies with equal force to scenarios in which a certain fixed sum is required to be paid by a client up front, with additional compensation to be paid on a contingency basis"). Once again, at this stage, the Court must assume Marcus & Shapira's factual averments are true and must also draw all reasonable inferences in its favor.  In doing so, the Court believes that Marcus & Shapira pleads factual averments sufficient to state a plausible quantum meruit claim.

## V.    **CONCLUSION**

For the foregoing reasons, the Court will deny Defendant Sandra Tarr's Motion to Dismiss Complaint. An appropriate Order follows.


/s/ *W. Scott Hardy*
W. Scott Hardy
United States District Judge

Dated:  December 16, 2025

cc/ecf:  All counsel of record

---

[4]    The Court finds Tarr's reliance on non-Pennsylvania cases pertaining to liquidated damages clauses to be inapposite and unavailing, especially when applied in the context of equitable claims such as quantum meruit.  The Court similarly finds Tarr's reliance on *Ryan v. Butera, Beausang, Cohen & Brennan*, 193 F.3d 210, 218 (3d Cir. 1999), to be misplaced. Nothing in *Ryan* stands for Tarr's contention that "the quantum meruit rule does not apply to agreements that have a non-refundable retainer clause."  (ECF No. 11, at 8).  To the contrary, *Ryan* holds, in part, that in circumstances where an attorney with a general retainer has been discharged, he or she "may recover 'at least in some circumstances, beyond payment for the value of services already rendered.'" 193 F.3d at 218 (citing *Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420, 449 (S.D.N.Y. 1998)).